AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| | ) |
| | ) |
| MONDO GREPHEDO CAINES | ) |
| | ) |

ORIGINAL

Case No.

6:18-mj- 1193

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   March 11, 2018 to March 16, 2018   in the county of   Osceola   in the
  Middle   District of   Florida, and elsewhere  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952(a); 18 U.S.C. § 2 | Importation of a Controlled Substance; Aiding and Abetting the Importation of a Controlled Substance |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Robert Palfrey, Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  3/17/18

_____
_Judge's signature_

City and state:          Orlando, Florida          Gregory J. Kelly, United States Magistrate Judge
_Printed name and title_

ORIGINAL

STATE OF FLORIDA                                 CASE NO. 6:18-mj- 1193

COUNTY OF ORANGE

## <u>MASTER AFFIDAVIT</u>

I, Robert Palfrey, Special Agent, Homeland Security Investigations, after

being duly sworn, depose and state the following:

## I.   <u>Introduction</u>

1.     I am a Special Agent ("SA") with the Department of Homeland

Security, Homeland Security Investigations ("HSI").  I am currently assigned to the

HSI Orlando, Florida office.  My present duties include, in part, conducting criminal

investigations into violations of federal laws pertaining to financial investigations and

narcotics importation investigations.  I have been an SA with HSI since 2006.  I have

received extensive training at the Federal Law Enforcement Training Center and

elsewhere in airport operations, border search authority, narcotics smuggling

techniques, and controlled deliveries.  I have participated in investigations of

violations of various federal criminal laws, including unlawful possession with intent

to distribute controlled substances, importation of controlled substances, conspiracy

to import, possess, and distribute controlled substances, and money laundering, all in

violation of Title 21 and Title 18 of the United States Code.  Prior to my

employment with HSI, I was a Customs and Border Protection Officer with United

States Customs and Border Protection.  On the basis of my training and experience

in conducting drug investigations, I have become familiar with the manner in which

large-scale drug traffickers and drug trafficking organizations operate. I have participated in investigations involving the sale and purchase of controlled substances, and have become knowledgeable with the methods used in the sale, manufacture, and distribution of controlled substances. These investigations have resulted in the arrests of individuals who have smuggled, received, and distributed controlled substances. These investigations have also resulted in seizures of illegal drugs and the proceeds of the distribution of those illegal drugs.

2.      The information contained in this affidavit is based on my personal knowledge and observations during the course of this investigation, along with information conveyed to me by other HSI Agents, HSI Task Force Officers, Drug Enforcement Administration Agents, Osceola County Sheriff's Deputies, and other witnesses.

3.      Because this affidavit is being submitted for the limited purpose of supporting the issuance of a criminal complaint for **MONDO GREPHEDO CAINES ("CAINES")**, as well as supporting the issuance of a search warrant for a cellular telephone phone, I have not set forth in the affidavit everything that I have learned as a result of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. As set forth in more detail below, I have probable cause to believe that **CAINES** did import, and aid and abet the importation of, approximately 1.38 kilograms of cocaine from Santo Domingo, Dominican Republic, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2. I also have probable cause to believe that an LG cell phone belonging to **CAINES** contains

2

evidence of the above-referenced violations.

## II.   Identification of Device to be Examined

4.    The property to be searched is a black LG cellular telephone (the "Device"), further described in Attachment A.  The Device is currently located at the HSI ASAC Orlando Office, 6643 Hazeltine National Dr., Orlando, Florida 32822.

5.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## III.   Summary of Investigation

6.    On March 11, 2018, U.S. Customs and Border Protection ("CBP") Officers at the Miami Foreign Mail Branch in Miami, Florida examined an express cargo parcel, tracking number MAWB #EE001675463DO (the "PARCEL").  The PARCEL was selected for inspection due to abnormalities observed during an x-ray examination.  Since the PARCEL was shipped from the Dominican Republic, based upon U.S. Customs Law (19 C.F.R § 162.6), the PARCEL had to be cleared at an international mail facility, and it required no suspicion to be searched.

7.    Upon inspection of the PARCEL on March 11, 2018, CBP Officers discovered inside the PARCEL a metal container. CBP Officers drilled a small hole in the container, at which time they discovered a white, paste-like substance inside. Officers detained the PARCEL and used a Narco Pouch #406B test kit to field test the white substance found therein, which tested positive for the presence of cocaine. CBP Officers in Miami were able to determine that the PARCEL contains an

3

estimated total amount of approximately 1380 grams (3.04 lbs.) of cocaine.

8.     On March 12, 2018, the CBP Miami Foreign Mail Branch notified HSI Miami that the substance from the PARCEL had field-tested positive for cocaine, a Schedule II controlled substance. CBP also provided information to HSI Miami regarding the PARCEL and its designated recipient.

9.     The PARCEL was addressed from a sender in Santo Domingo, Dominican Republic to an individual with the initials D.P. at XXXX Central Ave., Kissimmee, Florida.  Kissimmee is in Osceola County, within the Middle District of Florida.  XXXX Central Ave., Kissimmee is the address for an apartment complex.

10.     HSI Miami Special Agent J. Muller contacted Orlando HSI Special Agents to conduct a controlled delivery of the PARCEL.  On March 12, 2018, the PARCEL was forwarded to Orlando, Florida, for HSI Orlando to investigate.  HSI Agents in Orlando made contact with management personnel for the apartment complex, who advised that, based on their records, an individual named D.P. does, in fact, reside at XXXX Central Ave., Kissimmee, Florida, 34741.  Specifically, management personnel indicated that D.P. resides in Apt. No. XXX at that address. Furthermore, management personnel indicated that packages addressed to the apartment complex are delivered only to the residences of the individuals to whom the packages are addressed, and that if no one is home to receive a package, it is not delivered.  On March 15, 2018, this Court signed an anticipatory search warrant authorizing a search of Apt. No. XXX should the PARCEL be taken into the apartment at the time of a controlled delivery.

4

11.    On March 16, 2018, at approximately 10:00 a.m., a postal Agent acting in an undercover capacity knocked on the door of Apt. No. XXX at XXXX Central Ave., Kissimmee, Florida 34741 to conduct a controlled delivery of the PARCEL. A female later identified as Y.M. answered the door and advised the undercover Agent that the PARCEL was intended for her boyfriend, D.P. Y.M. advised the Agent that she was expecting the package and had authority from D.P. to take delivery of the package. The undercover Agent had Y.M. sign the delivery slip, at which time Y.M. took the PARCEL into the residence and closed the front door.

12.    At approximately 10:20 a.m., HSI Agents approached the residence and announced "Police Search Warrant," at which time Y.M. opened the door. Agents entered the residence and secured the premises to conduct further investigations.

13.    HSI Agents conducted a post-Miranda interview with Y.M., who advised that the PARCEL was intended for her boyfriend, whom Y.M. identified as D.P. Y.M. further advised that the PARCEL had been sent from a friend of D.P.'s, whom Y.M. identified as S.C., and whom Y.M. stated is currently living in the Dominican Republic. Y.M. advised that D.P. had recently received a phone call from S.C., during which S.C. asked D.P. if he would receive a package containing motorcycle parts for an unknown person in the Orlando, Florida area. Y.M. advised that D.P. agreed to receive the package after being told that the package would only contain motorcycle parts, and that D.P. provided S.C. with his address of XXXX Central Ave., Kissimmee, Florida 34741.

14.    Y.M. also stated that on or about March 13, 2018, D.P. began to

receive numerous phone calls from S.C. asking if the package had been delivered. These phone calls continued from S.C., at which time Y.M. and D.P. began to question the legitimacy of the package. When D.P. asked S.C. about the legitimacy of the package, S.C. offered to pay D.P. two-hundred dollars to receive the package.

15.     Y.M. stated that D.P. had been tracking the package via his personal telephone. Y.M. stated that she had no further information on the package and never talked to anyone except D.P. about the package. Y.M. then called D.P., at which time Agents asked D.P. to return to the residence. D.P. agreed to do so.

16.     After D.P. returned to the residence and was read his Miranda rights, D.P. agreed to talk with the Agents. D.P. advised that his friend, S.C., who lives in Santo Domingo, Dominican Republic, called D.P. several days ago and asked him if he would receive a package at his residence containing motorcycle parts. S.C. told D.P. that the package contained only the motorcycle parts, which were for a person whom S.C. did not know very well, and that S.C. wanted to make sure that the parts arrived and were delivered.

17.     D.P. advised that after he agreed to receive delivery of the package, S.C. called him numerous times a day asking if the package had arrived. Based on S.C.'s continuous phone calls, D.P. began to question the legitimacy of the package. S.C. continued to tell D.P. that the package was clean and only contained motorcycle parts, but offered to pay D.P. two-hundred dollars to receive the package. D.P. advised that he had S.C.'s phone number, which he provided to Agents.

18.     D.P. further advised that after Y.M. received delivery of the package,

6

she took a picture of the package and texted the picture to D.P., at which time D.P. sent S.C. a text message informing S.C. that the package had arrived and attaching a picture of the package. While Agents were interviewing D.P., he received a phone call from S.C. informing him that another person would call to make arrangements to pick up the package.

19.     Within a few minutes of D.P.'s conversation with S.C., a male individual whom D.P. did not know called D.P from phone number (404) XXX-XX65 and told D.P. that he was en route from the Miami area to pick up the package. The unknown male continued to call D.P. to provide updates as to his location. After approximately three-and-one-half hours, *i.e.* at approximately 5 p.m. on March 16, 2018, the male called D.P. again and informed D.P. that he had arrived and was walking up the stairs to D.P.'s residence. At about this same time, Agents conducting surveillance in the parking lot of the apartment complex observed a black male, later identified as **CAINES,** exit the driver's seat of a silver Toyota Prius, bearing Georgia tag No. XXXXX23, and walk directly to the front door of D.P.'s residence.

20.     **CAINES** proceeded to knock on the front door of D.P.'s residence, at which time an Agent acting in an undercover capacity answered the door. **CAINES** entered the residence where he proceeded to apologize for the long delay. After a short conversation, the undercover Agent asked **CAINES** if he brought the money, at which time **CAINES** stated that he had the money. The undercover Agent then

told **CAINES** that he was going to go get "the dope." **CAINES** then told the undercover Agent again that he had the money and proceeded to pull his wallet from his front pocket and open it, displaying numerous fifty-dollar bills. The undercover Agent then told **CAINES** let me get "the dope," at which time the Agent walked into the bedroom. As the undercover Agent walked into the bedroom, other Agents exited the bedroom and secured **CAINES**.

21.     Incident to **CAINES'S** arrest, Agents recovered from **CAINES'S** person a wallet containing a Georgia driver's license displaying the name **MONDO GREPHEDO CAINES** and displaying a photograph of **CAINES**. In the meantime, law enforcement officers in the parking lot approached the silver Toyota Prius and observed that there was a male individual in the front passenger seat of the vehicle. This male passenger indicated that he had traveled to Orlando with "Mondo." This passenger identified in the vehicle what he said was his own cell phone, for which he provided a valid unlock code. There were two other cell phones located on the center console of the silver Toyota Prius, which the male passenger indicated belonged to "Mondo." One of these two cell phones was a black LG cell phone (the "Device") further described in Attachment A, which was turned on and unlocked, and which displayed in plain view on the screen of the Device a photograph of the PARCEL, as well as a photograph of the tracking number of the PARCEL.

## IV.  **Technical Terms**

22.     Based on my training and experience, I use the following technical
terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or
cellular telephone) is a handheld wireless device used for voice and
data communication through radio signals.  These telephones send
signals through networks of transmitter/receivers, enabling
communication with other wireless telephones or traditional "land
line" telephones.  A wireless telephone usually contains a "call log,"
which records the telephone number, date, and time of calls made to
and from the phone.  In addition to enabling voice communications,
wireless telephones offer a broad range of capabilities.  These
capabilities include: storing names and phone numbers in electronic
"address books;" sending, receiving, and storing text messages and
e-mail; taking, sending, receiving, and storing still photographs and
moving video; storing and playing back audio files; storing dates,
appointments, and other information on personal calendars; and
accessing and downloading information from the Internet.  Wireless
telephones may also include global positioning system ("GPS")
technology for determining the location of the device.

9

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

10

d.  GPS: A GPS navigation device uses the Global Positioning System
    to display its current location. It often contains records the locations
    where it has been. Some GPS navigation devices can give a user
    driving or walking directions to another location. These devices can
    contain records of the addresses or locations involved in such
    navigation. The Global Positioning System (generally abbreviated
    "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each
    satellite contains an extremely accurate clock. Each satellite
    repeatedly transmits by radio a mathematical representation of the
    current time, combined with a special sequence of numbers. These
    signals are sent by radio, using specifications that are publicly
    available. A GPS antenna on Earth can receive those signals.
    When a GPS antenna receives signals from at least four satellites, a
    computer connected to that antenna can mathematically calculate
    the antenna's latitude, longitude, and sometimes altitude with a high
    level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic
    device used for storing data (such as names, addresses, appointments
    or notes) and utilizing computer programs. Some PDAs also
    function as wireless communication devices and are used to access
    the Internet and send and receive e-mail. PDAs usually include a

11

memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the

12

structure of the Internet, connections between devices on the
Internet often cross state and international borders, even when the
devices communicating with each other are in the same state.

23.     Based on my training, experience, and research, I know that the Device
has capabilities that allow it to serve as a wireless telephone, digital camera, portable
media player, GPS navigation device, and PDA.  In my training and experience,
examining data stored on devices of this type can uncover, among other things,
evidence that reveals or suggests who possessed or used the device.

## V.     Electronic Storage and Forensic Analysis

24.     Based on my knowledge, training, and experience, I know that
electronic devices can store information for long periods of time.  Similarly, things
that have been viewed via the Internet are typically stored for some period of time on
the device.  This information can sometimes be recovered with forensics tools.

25.     *Forensic evidence.*  As further described in Attachment B, this application
seeks permission to locate not only electronically stored information that might serve
as direct evidence of the crimes described on the warrant, but also forensic evidence
that establishes how the Device was used, the purpose of its use, who used it, and
when.  There is probable cause to believe that this forensic electronic evidence might
be on the Device because:

> a.  Data on the storage medium can provide evidence of a file that was
> once on the storage medium but has since been deleted or edited, or

13

of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

14

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27.   *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VI.    Conclusion

28.    Based on my experience, training, knowledge of this investigation, and information provided to me by other witnesses, I believe that probable cause exists to believe that **CAINES** has committed violations of 21 U.S.C. § 952(a) (importation of a controlled substance) and 18 U.S.C. § 2 (aiding and abetting the importation of a controlled substance).  I also believe that probable cause exists to believe that the Device described in Attachment A contains evidence of these same violations. Therefore, I request the issuance of a search warrant authorizing the examination of the Device described in Attachment A, and the seizure of fruits, evidence, and instrumentalities of these crimes as described in Attachment B.


Special Agent Robert Palffey
Homeland Security Investigations

Sworn and subscribed before me
this 17th day of March, 2018.

The Honorable Gregory J. Kelly
United States Magistrate Judge

16

## ATTACHMENT A

The property to be searched is a black LG cellular telephone, hereinafter the "Device." The Device is currently located at the HSI ASAC Orlando Office, 6643 Hazeltine National Dr., Orlando, Florida 32822.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of 21 U.S.C. § 952(a) and involve **MONDO GREPHEDO CAINES ("CAINES")**, including:

   a.  lists of customers and related identifying information;

   b.  types, amounts, and prices of drugs imported, as well as dates, places, and amounts of specific transactions;

   c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d.  any information recording **CAINES'S** schedule or travel from March 1, 2018, to the present; and

   e.  all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have

been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.